IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Cory T. Credell, | ) | Civil Action No. 8:10-cv-18-RMG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Warden McKeither Bodison, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| | ) | |

This Petition comes before the Court pursuant to 28 U.S.C. §2254. In accord with 28 U.S.C. §636(b) and Local Rule 73.02, S.S.C., this matter was referred to United States Magistrate Judge Bruce Howe Hendricks. Judge Hendricks issued to the Court a Report and Recommendation recommending that the Petition for Writ of Habeas Corpus be granted. (Dkt. No. 39.) Respondent opposes the grant of the Writ.

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Matthews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and the Court may accept, reject or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The Court, after a careful review of the record before the State trial court and the State post-conviction proceeding and application of controlling legal standards set forth in statutory and case law, grants the Petition for Writ of Habeas Corpus in part and denies the Petition in part. As set forth more fully below, the Court finds, notwithstanding the utilization in tandem of the highly deferential standards for review under 28 U.S.C. § 2254(d) and *Strickland v. Washington*, 466 U.S. 668 (1984), that the State trial court counsel committed a series of acts and omissions which were significantly outside the "wide range of professionally competent assistance". *Strickland v. Washington*, 466 U.S. at 690.    The Court finds that in one of these areas of professionally deficient performance—relating to informing and counseling the Petitioner regarding the decision to testify and, if so, the scope of that testimony—resulted in actual prejudice to the Petitioner so great that it "upset the adversarial balance between defense and prosecution that the trial was rendered unfair and verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).    The Court further concludes that the State PCR court's finding that the profoundly deficient performance by trial counsel was actually part of a professionally reasonable trial strategy was "based on an unreasonable application of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).    Having concluded that it is "reasonably likely" that State trial counsel's errors affected the outcome of Petitioner's trial, the Court grants the Writ conditionally to provide the State with adequate time to decide whether to retry the Petitioner. *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011); *Strickland v. Washington*, 466 U.S. at 694.

## Background

Around noon on September 30, 1998, two men entered the home of Trevor "Peter" Jefferson and his girlfriend, Shiwanna Mazyck, located on Nonnie Curve Road in Orangeburg County. (App. 55, 90-91, 182-83.) Jefferson, Mazyck, and her three children were home at the time. (App. 56, 91.) Mazyck was coming out of the bathroom into the hallway with one of her children when the men entered. (App. 93; 114; 117.) One of the men placed a gun to her head and ordered her to lie down on the floor. *Id.* Mazyck testified that the second man, who had dreadlocks, covered Mazyck's head with a pillow and held her down on the floor. (App. 93-94.) Mazyck testified she saw him face to face "for a good minute." (App. 118; 120.) While held to the floor by the second man, Mazyck heard the first man walk to the bathroom, ask Jefferson his name and fire three shots. (App. 93.) Immediately after the shots were fired, the men fled the home. (App. 95-96.) Jefferson died as a result of the gunshot wounds. (App. 173-74.)

When initially speaking with police, Mazyck did not tell the police that she recognized the man who held her down. (App. 105; 183.) But some time later, Mazyck informed investigators that the second man who held her down looked familiar though she did not know him by name. (App. 98, 183.) Then, on October 6, 1998, Mazyck identified the Petitioner as the perpetrator by picking his photo out of a photo lineup. (App. 99; 188.) At trial, Mazyck identified the Petitioner as the second man and she testified that she had seen the Petitioner at her house with Jefferson about two or three months prior to Jefferson's murder. (App. 95; 99-100.)

A school bus driver, Jerlein Goodwin ("J. Goodwin"), stated that she saw a burgundy car with Florida license tags on Nonnie Curve Road at approximately 12:20

p.m. on the day of the shooting. (App. 133-34.) The bus driver also stated that she saw two black men standing beside the rear of the car. (App. 134-35.) A teachers' aide, Dorothy Goodwin ("D. Goodwin"), was also on the bus that day. (App. 144.) She stated that she also saw the burgundy car and there was one man in the car and two black men standing by the car. D. Goodwin stated that the two men standing by the car had on black clothing and one of the men had short dreadlocks which were sticking out of his hood. (App. 144, 147.) She testified that the man had shorter dreadlocks than the Petitioner had at the time of the trial. (App. 147-48.) She also stated that the man with the dreadlocks had something long in his hand, which, she believed, could have been a gun. (App. 145.) Neither of the Goodwins could positively identify or exclude the Petitioner as one of the two men they saw that day. (App. 135, 147-48.)

Based on the information provided by the Goodwins and other persons regarding the possible ownership of the car, law enforcement officers went to the home of Ronald Duggins where they found a burgundy Dodge Spirit with Florida tags. (App. 184-85, 194, 187.) The Sheriff's investigator, David Coleman, testified that Duggins stated that he had given a person named "Cory" a ride on the day of the murder. (App. 192.) Duggins stated he did not know "Cory's" last name but that the Sheriff's Department had "Cory's" picture. *Id.* Coleman testified he looked through the photos beginning with the letter "A" looking for any "Corys". (App. 192-93.) Investigator Coleman testified that he came upon a photo of Petitioner, Cory Credell, in the course of this search, who fit the general description of the suspect including the presence of dreadlocks. Coleman then compiled a photo-lineup from which Mazyck subsequently identified Petitioner. (App. 193.) Later, Duggins also picked the Petitioner out of the photo lineup. (App. 349.)

At trial, Duggins was called by the defense. He testified that he had known the Petitioner for several years and that he, the Petitioner, Jefferson, and Mazyck were all friends. (App. 330; 332; 349.) Duggins testified that the burgundy car spotted on Nonnie Curve Road had been rented by his cousin. (App. 335.) He testified that he was driving the car on Nonnie Curve Road on the day of the shooting and two men flagged him down. (App. 340-41.) Duggins testified that he told the police the men's names were "Cory" and "Vick," but he later admitted that he made up the names in an attempt to secure a personal recognizance bond. (App. 340, 342.) Duggins testified he was not specifically referring to the Petitioner and that he knew the Petitioner's first and last name. (App. 340.) Duggins testified he identified the Petitioner in the photo line-up because Coleman told him that Mazyck had already identified the Petitioner. (App. 349.) He testified he lied when he initially identified the Petitioner. (App. 346; 350.)

In 1998, six fingerprints were lifted from the car and in January 2001, it was determined that the one of the prints, a partial print from the outside rear door on the driver's side door, matched the Petitioner's fingerprints. (App. 256; 259-60; 266; 269; 275.) The murder weapon was never found and no physical evidence was discovered at the murder scene. The shooter has never been identified.

Petitioner was indicted in August and November 2000 for murder and robbery. (App. 688-91.) Because the public defender had a conflict in the case, the Orangeburg County Clerk of Court appointed Jane Berry Osborne (hereafter referred to as "trial counsel") to represent the Petitioner from a list of attorneys licensed to practice in Orangeburg County. (App. 558.) Trial counsel had never previously tried a criminal case and her sole experience in the criminal arena had been to participate in a guilty plea in a

DUI case. (App. 560.) Her professional experience was primarily limited to a bankruptcy and family law practice. (App. 559.) Further, despite her lack of experience in the area of criminal law, trial counsel did not ask the Court to appoint a more experienced counsel to replace or assist her and did not seek the assistance of other counsel at trial. (App. 625-27.)

The jury trial began on May 15, 2001, with the Honorable Luke N. Brown presiding, and was concluded on May 17, 2001, when the jury returned a verdict of guilty on both charges. Petitioner was then sentenced to two life sentences to be served concurrently. (Supp. App. II 32, 37.) He timely filed a direct appeal.

On appeal, the Petitioner was represented on appeal by Joseph L. Savitz, III. On June, 18, 2002, Savitz filed an *Anders* brief raising the following issue: "The judge erred by allowing the state to pit a critical defense witness against two prosecution witnesses." (App. 431.) On July 15, 2002, the Petitioner filed a *pro se* brief raising the following issue, quoted verbatim: "Did the trial court error in denying the motion to dismiss the charges due to the state's failure to disclose possible exculpatory information?" (Return Attach. # 4.) On April 15, 2003, the South Carolina Court of Appeals dismissed the appeal. (App. 438-39.) The remittitur was sent down on May 16, 2003. (Return Attach. # 5.)

On October 2, 2003, the Petitioner filed an application for post-conviction relief ("PCR") raising the following ground for relief: "Applicant was denied the right to effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and state law, in that trial counsel failed to object to the State's pitting of witnesses." The Petitioner then filed an amended application for

PCR adding further grounds for relief, including alleged prejudicial errors in eliciting and failing to object to testimony regarding prior bad acts and failing to provide competent advice concerning the Petitioner's decision to testify. (App. 440-54.)

On January 19, 2006, an evidentiary hearing was held before the Honorable Lee S. Alford. (App. 454.) On May 8, 2006, the PCR denied the Petitioner's application for PCR. (App. 661-685.) The Petitioner then filed a petition for Writ of Certiorari with the South Carolina Supreme Court. On June 12, 2008, the Court granted the Petitioner a writ certiorari. (Return Attach. # 11.) Following briefing, however, the Court issued an order dismissing the writ of certiorari as improvidently granted. (Return Attach. # 12.) The remittitur was sent down on July 29, 2009. (Return Attach. # 13.) The Petitioner then filed this habeas petition. (Habeas Pet. at 6 and Attach. 1-16.) The grounds raised, relevant to the inquiry as to whether the petition should be granted, are addressed herein.

**Law/Analysis**

**I.     Standard of review in habeas matters**

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir.1998). Under the AEDPA, Federal habeas corpus relief may not be granted unless the relevant state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," 28 U.S.C.A. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398

(2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410.

In the context of an ineffective assistance of counsel claim, as raised by Petitioner here, to prevail, Petitioner must show (1) that his trial counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1985). The Court must apply a "strong presumption" that trial counsel's representation fell within the "'wide range' of reasonable professional assistance", and the errors must be "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*. 131 S.Ct. at 787. This is a high standard, one in which a habeas petitioner alleging prejudice must show that counsel's errors  deprived the him "of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. That the outcome would "reasonably likely" have been different but for counsel's error is not dispositive of the "prejudice" inquiry. Rather, the Court must determine whether the result of the proceeding was fundamentally unfair or unreliable. *Harrington v. Richter, 131 S.Ct. at 787-88; Strickland v. Washington,* 466 U.S. at 694. Described otherwise, the ineffectiveness of counsel must upset the adversarial balance in the case. *Kimmelman v. Morrison*, 477 U.S. 365 (1986). Thus, under the *Strickland* standard, Petitioner must show that "it is reasonably likely that the result would have been different." *Harrington*

-8-

*v. Richter*, 131 S. Ct. at 792. This likelihood of a different result must be "substantial, not just conceivable." *Id.*

The United States Supreme Court has cautioned that "'[s]urmounting *Strickland's* high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 131 S.Ct. at 788 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)). When evaluating an ineffective assistance of counsel claim, the petitioner must satisfy the highly deferential standards of 28 U.S.C. § 2254(d) and *Strickland* "in tandem", making the standard "doubly" more difficult. *Harrington v. Richter*, 131 S.Ct. at 788. In such circumstances, the "question is not whether counsel's actions were unreasonable", but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standards. " *Id.* Stated otherwise, the unreasonableness of the State court determination must be "beyond any possibility of fairminded disagreement." *Id.* at 787. While the standards of the AEDPA a meant to be "difficult", "§ 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* at 786. The habeas remedy is intended to be used sparingly to "guard against extreme malfunctions in the state criminal justice systems" and is not to be used as "a substitute for ordinary error correction through appeal." *Id. See also, Tice v. Johnson*, ___ F.3d ___, 2011 WL 1491063 at 14 (4th Cir. 2011) ("[C]ounsel's performance will not be deemed deficient except in those relatively rare situations where, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'", *citing Strickland v. Washington*, 466 U.S. at 690)

In analyzing ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"); *Hoots v. Allsbrook*, 785 F.2d 1214, 1219 (4th Cir.1986) (considering ineffective assistance claims individually rather than considering their cumulative impact). Further, it is well settled that simply because the attorney is inexperienced or practiced in an area other than criminal law is not sufficient to establish ineffective assistance of counsel. *United States v. Cronic*, 466 U.S. 648, 665 (1984) ("Every experienced criminal defense attorney once tried his first criminal case.") The analysis of ineffective assistance of counsel must focus on the "actual performance" of the attorney. *Id.*

Courts have also shown a marked and understandable reluctance to characterize tactical or strategic decisions by trial counsel as ineffective assistance. *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002). A "strong presumption" exists that counsel's actions were the function of trial tactics and not "sheer neglect." *Harrington v. Richter*, 131 S.Ct. at 790. This rule, however, is not absolute where the purported strategic decision is based upon an error or ignorance of the law by trial counsel. *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2nd Cir. 2009) (omissions based upon "oversight, carelessness, ineptitude or laziness" cannot be explained as "trial strategy"); *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) (a strategic choice made without a professionally competent investigation of the Petitioner's options is "erected upon...a rotten foundation" and is not entitled to deference); *Fowler v. Delo*, 11 F.3d 1451, 1457 (8th Cir. 1994) (failure of

counsel to inform Defendant of his right to testify in the penalty phase of a death penalty trial "impeded an informed decision" and is professionally deficient); *Blackburn v. Foltz*, 828 F.2d 1177, 1182 (6th Cir. 1987) (a trial decision made on the basis of trial counsel's lack of familiarity with established evidence law was "not based on strategy, but on mistaken beliefs and 'a startling ignorance of law.'")

## II. Trial Counsel's Advice to Petitioner Concerning Whether to Testify and the Scope of his Testimony

The Petitioner in this action sought the advice of his State trial counsel concerning whether he should testify and, if so, the scope of his testimony. The advice provided by trial counsel was related to a critical issue—whether Petitioner should testify—and was impaired by her profound ignorance of the law of evidence, particularly regarding the admissibility of such "bad act" evidence as a prior history of drug dealing, previous misdemeanor convictions and prior arrests which did not lead to a felony conviction and the rule that the Petitioner's prior felony conviction for would not be disclosed to the jury unless the Petitioner took the stand and was impeached. According to trial counsel's testimony at the State post-conviction proceeding, she mistakenly believed "in my gut" that all of the bad act evidence would be admissible even if the Petitioner did not testify. (App. 623.) Consequently, she did not advise the Petitioner that if he elected not to testify the jury would not be made aware of his criminal record. (App. 593-94.) She also did not inform the Petitioner that if he elected not to testify the Judge would instruct the jury not to hold this against him. (App. 594.)

Trial counsel advised Petitioner to take the stand and to testify on his own behalf. Moreover, because of the mistaken belief that "bad act" evidence was generally admissible, trial counsel had the Petitioner disclose to the jury on direct examination that

-11-

he was a drug dealer, had been involved in the drug trade with the victim, had been convicted of several misdemeanors (including possession of marijuana) and had numerous prior arrests. (App. 393, 394, 398.)[1] When the Petitioner was cross-examined, trial counsel did not object to questions concerning prior arrests, misdemeanor convictions and life as a drug dealer. (App. 412, 415.) This led to unobjected questions by the prosecutor to the Petitioner concerning whether the drug trade was a "violent business" and observing that the Petitioner had "basically spent your entire life in trouble." (*Id.*)

Under questioning by Judge Alford at the State post-conviction proceeding, trial counsel admitted an ignorance of the standards of Rule 609 and the interplay with Rule 403.[2] (App. 622-23.) When Judge Alford pressed her on whether these same evidentiary issues might have arisen in her family court cases, trial counsel thought perhaps she had seen Rule 609 at some time in her legal career but was confident she had not considered it in her representation of the Petitioner. (App. 623-24.) She also expressed surprise that she could have requested an *in camera* hearing before the Court under Rules 609, 403 and 404(b) to determine which portions of the Petitioner's criminal history or bad act evidence would be disclosed to the jury. (App. 592.) She simply explained "I did not know I could do that." (*Id.*)

Counsel's striking ignorance of state evidence law profoundly affected the course of Petitioner's trial. The State's case involved evidence of a violent, unexplained home invasion leading to the execution murder of Mr. Jefferson. The failure of the key

---

[1] Petitioner had no prior felony drug conviction and had a single prior felony conviction for armed robbery.

[2] South Carolina adopted the South Carolina Rules of Evidence in 1995. South Carolina Rules 403, 404(b) and 609(a) are identical to the Federal Rules of Evidence.

prosecution witness, Ms. Mazyck, to disclose initially that she recognized one of the men involved in the crime raised some questions regarding her credibility and reliability. The State offered no direct evidence of motive and little context for what ultimately resulted in an execution style murder. There was no laboratory evidence placing the Petitioner in the victim's residence, although his fingerprints were found on the outside of a vehicle observed near the crime scene.

The offering by Petitioner *on direct examination* and after the State had rested its case that he was a drug dealer and had been involved in the drug trade with the victim provided potential evidence of motive and context for the crime. Such evidence was not admissible under Rule 404(b) and, since the Petitioner had no prior felony drug conviction, was not proper impeachment matter under Rule 609. The introduction of such profoundly prejudicial evidence by the Petitioner destroyed any suggestion of a meaningful defense and shifted the focus away from the arguable defects in the State's case. Similarly, the voluntary disclosure of misdemeanor convictions, including one drug related, and prior arrests which never led to any convictions, supported the image of the Petitioner as a career criminal.

Trial counsel clearly did not provide competent professional advice concerning whether the Petitioner should testify, and, if so, what he should offer on direct examination. It is well established under "prevailing norms of practice", such as the American Bar Association Standards, that a defense counsel has the duty to "inform[] himself or herself fully on . . . the law" and then "advise the accused . . . concerning all aspects of the case." ABA Standards for Criminal Justice 4-5.1(a) (2d Ed. 1980); *Strickland v. Washington*, 466 U.S. at 688. This advice is particularly critical regarding

-13-

whether a defendant should testify because this is a decision that must be "made by the accused after full consultation with counsel." ABA Standards 4-5.2(a)(iv).

Trial counsel's ignorance of basic evidence law denied Petitioner meaningful professional advice concerning whether he should testify. Petitioner testified at the State PCR proceeding that had he been aware that his criminal record (a single armed robbery conviction) would not have been disclosed if he did not testify, he would not have elected to take the stand. (App. 540-41.) While recognizing that the Petitioner's testimony at this stage is certainly self-serving, the Court concludes from a full review of the record that had defense counsel possessed a rudimentary knowledge of the law of evidence and provided competent advice to her client, he most probably would not have taken the stand.

The Court further finds that even if the Petitioner had taken the stand, a competent counsel providing professionally responsible advice under no circumstances would have advised the Petitioner to volunteer his history of drug dealing, prior association in the drug trade with the victim, misdemeanor convictions and arrests. The voluntary introduction of this profoundly prejudicial evidence by defense counsel was the direct result of her ignorance of the most basic precepts of the law of evidence.

The State court in the post-conviction proceeding concluded that trial counsel's introduction of this devastating bad act evidence was part of a "defense trial strategy" of admitting "the felony, misdemeanors and drug dealing but deny he committed these much more serious charges." (App. 679.) A careful review of the entire record before the Court, including trial counsel's thorough examination at the post-conviction proceeding by both PCR counsel and the State court judge, leads to the inescapable conclusion that

trial counsel's acts and omissions relating to bad act and criminal history testimony were grounded on a fundamental ignorance of the law of evidence, which caused her to mistakenly conclude that such inadmissible evidence would be admitted. Any purported trial strategy to combat this highly prejudicial evidence arose out of this fundamental ignorance of evidence law. In finding that Petitioner's voluntary disclosure of prior bad acts was the function of a "defense trial strategy", the State PCR court did not address the direct relationship of this purported strategy to trial counsel's seriously deficient knowledge and application of evidence law. (App. 679.)[3]

While recognizing that broad deference is given to trial counsel in the exercise of tactical judgments, including whether the accused will take the stand and what he might state on direct examination, such deference is not unlimited or absolute. In a narrow set of cases, where trial counsel's advice is based upon "a startling ignorance of the law", "oversight, carelessness, ineptitude or laziness", the "purportedly strategic decision" will be deemed not "objectively reasonable" and determined to constitute ineffective assistance of counsel. *Blackburn v. Foltz*, 828 F.2d at 1182; *Wilson v. Mazzuca*, 570 F.3d at 502; *Ramonez v. Berghuis*, 490 F.3d at 488. The Court concludes that the remarkable facts presented by this record, dominated by trial counsel's lack of foundational knowledge regarding elementary but critical issues of evidentiary law and her actions in introducing clearly prejudicial and otherwise inadmissible evidence as a result of her

---

[3] The Court finds particularly credible trial counsel's testimony at the State PCR evidentiary hearing that she was acting on the misapprehension that all bad act evidence was admissible when she advised Petitioner to take the stand and to volunteer highly prejudicial and otherwise inadmissible evidence regarding prior bad acts. (App. 623.) Otherwise, the Court cannot conceive of a circumstance where a professionally competent trial counsel would undertake such a course of action.

ignorance of the law, combined to create one of those rare circumstances where trial counsel's actions under these circumstances is found to be professionally unreasonable.

Moreover, the Court concludes that the State PCR court's finding that the voluntary submission of highly prejudicial and otherwise inadmissible bad act evidence was the product of a professionally reasonable defense strategy is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The basic flaw in the State PCR court's finding is its failure to recognize that the purported trial strategy was based upon trial counsel's fundamental misunderstanding of the scope of admissible evidence in a criminal trial and that such ignorance of the law of evidence placed the acts of trial counsel significantly outside the wide range of reasonable professional assistance.   When the full circumstances of trial counsel's decision to have her client take the stand and volunteer profoundly prejudicial and inadmissible evidence are considered, the Court concludes that no "fairminded jurist" could find that her actions remotely met even the minimal and highly deferential standards for effective assistance of counsel under *Strickland* and § 2254(d).

It is well established under *Strickland* that a professionally unreasonable action by trial counsel, standing alone, does not warrant setting aside a judgment unless it can also be shown that the error had an "effect on the judgment." *Strickland v. Washington*, 466 U.S. at 692.   Petitioner carries the burden of establishing that in the absence of the professionally unreasonable action by trial counsel  that "it is reasonably likely the result would have been different." *Harrington v. Richter*, 131 S.Ct. at 792. This likelihood of a "different result" must be substantial, not just conceivable." *Id.*

-16-

The State's case in this matter contained areas of potential vulnerability. These included the inconsistency of the key prosecution witness, Ms. Mazyck, regarding her prior knowledge of the Petitioner, the lack of laboratory evidence placing the Petitioner at the murder scene and the inability of the two school bus drivers to identify the Petitioner as one of the men they saw near the residence on the day of the murder. There was also little evidence of motive. The State did, however, have evidence of the Petitioner's fingerprint on an automobile seen near the murder scene and the eyewitness statement of Ms. Mazyck identifying the Petitioner as being present in her home.

Trial counsel's actions in introducing on direct examination clearly inadmissible evidence of the Petitioner's background as a drug dealer and his personal dealings with the victim in the drug trade provided the State key missing evidence regarding motive and provided a context for the home invasion. Further, the voluntary offering of an inadmissible history of arrests and misdemeanor convictions compounded the impression of the Petitioner as a career criminal. None of this evidence would have been admitted had the Petitioner stayed off the stand, which the Court has concluded most probably would have been the case if counsel and her client had been aware of the relevant law of evidence at the time.

Taking the record as a whole and removing the Petitioner's direct and cross examination, the Court concludes "it is reasonably likely the result would have been different" had the Petitioner not taken the stand.[4] *Harrington v. Richter*, 131 S. Ct. at 792. The Court concludes that the inherent weaknesses of the State's case would have

_____

[4] Although the Court finds that had counsel and her client been properly informed regarding the rules of evidence the Petitioner would most probably have not testified, the Court further finds that it is reasonably likely that the result would still have been different if the Petitioner had testified and limited his criminal history testimony to his single armed robbery conviction.

been the focus of the trial without the incendiary introduction of evidence of drug dealing, prior business dealings with the victim and a long personal criminal history. The introduction of such inadmissible and prejudicial evidence "so upset the adversarial balance between defense and prosecution that the trial was rendered unfair...". *Kimmelman v. Morrison*, 477 U.S, at 374. The Court finds that it is reasonably likely that the outcome would have been different in the absence of trial counsel's professionally unreasonable actions and that such liklihood is sufficient to undermine the Court's confidence in the outcome of the State court trial. *Harrington v. Richter*, 131 S.Ct. at 787; *Strickland v. Washington,* 466 U.S. at 694. For these reasons, the Court hereby grants the Writ of Habeas Corpus subject to the terms set forth below.

### III.    Other Grounds Asserted by Petitioner for Habeas Relief

Petitioner has asserted a variety of other grounds for habeas relief arising from trial counsel's alleged ineffective assistance of counsel. These include claims trial counsel failed to subpoena alibi witnesses from out of state because of an ignorance of statutes allowing for the subpoena of witnesses from other states, failed to object to the prosecution "pitting" the testimony of various witnesses and failed to attempt to rehabilitate the testimony of a defense witness with the use of a prior consistent statement. While some of these claims raise to some degree issues regarding trial counsel's professional competence, the Petitioner has failed to carry his burden of demonstrating that any of these issues individually would reasonably likely have changed the outcome of the trial. Consequently, the Petitioner cannot establish the presence of actual prejudice on any of these other grounds, which is essential to grant habeas relief . *Harrington v. Richter*, 131 S.Ct. at 792; *Strickland v. Washington*, *466* U.S. at 691-92.

The Petitioner's claim related to the failure of trial counsel to subpoena potential New York based alibi witnesses requires some comment by the Court. Petitioner asserted an alibi defense and offered the testimony of his mother that he was in New York at the time of the murder. Since he resided partially with his mother and partially with a girlfriend at the time, the mother could not definitively account for Petitioner's whereabouts on the day of the murder. Petitioner testified that he provided to his trial counsel the names of various persons who could support his alibi defense, which allegedly included the girlfriend. (App. 519.) Petitioner testified that trial counsel told him that South Carolina law did not provide for the subpoenaing of out of state witnesses. (App. 521.)

Trial counsel acknowledged she was aware of and spoke to the New York based girlfriend, and the girlfriend reportedly was able to provide a specific alibi for Petitioner on the day of the murder. (App. 565-66, 614-16.) The girlfriend reportedly would not voluntarily come to South Carolina for the trial. (*Id.*) Trial counsel admitted she was unaware that she had the ability to compel an out of state witness to attend the trial by way of subpoena[5], and this ignorance of the law affected the manner in which she had handled the defense. (App. 653-64.) The difficulty the Court has with the alleged testimony of the girlfriend is that she never offered any statement under oath, which makes the trial counsel's account of her testimony hearsay. This is compounded by the fact that at the time of the PCR hearing the girlfriend had apparently married a serviceman and could no longer be located. (App. 603.) Therefore, while trial counsel's failure to subpoena the girlfriend from New York constituted professionally deficient performance, the Court has no reliable evidence upon which to determine whether the

---

[5] *See*, S.C. Code Section 19-9-10 *et. seq.*

girlfriend's testimony "reasonably likely" would have affected the outcome of the State criminal trial. *Harrington v. Richter*, 131 S.Ct. at 792.

Petitioner did offer at the PCR hearing the testimony of three New York based witnesses who attempted to provide him an alibi. None of these witnesses were contacted by trial counsel prior to the Petitioner's criminal trial. While these witnesses were able to testify at the State PCR hearing that Petitioner was living in New York during the general time period of the murder, they could not account for his whereabouts on the specific date of the murder. (App. 476, 477, 487, 489, 491, 502, 506). The State PCR court was, thus, correct in finding that these witnesses did not actually provide Petitioner an alibi (App. 665), and the Petitioner has not established that any error of trial counsel in failing to subpoena these witnesses would "reasonably likely" have changed the outcome of the trial. *Harrington v. Richter*, 131 S.Ct. at 792.

Petitioner also asserts a claim relating to the failure of trial counsel to object to the State "pitting" the testimony of various witnesses. The Magistrate Judge described in detail the multiple episodes of witness "pitting" that occurred in the course of the trial, and the failure of trial counsel to object. (Dkt. 39 at 16-18). Trial counsel testified at the PCR hearing she was unaware she could object to the State's pitting of witnesses. (App. 569, 572-73.) While the State's "pitting" of witness testimony at Petitioner's criminal trial was clearly improper under South Carolina law[6], Petitioner has failed to carry his burden of establishing that most probably the outcome of the trial would have been different in the absence of the "pitting" of witnesses.

---

[6]
*See, State v. Brown,* 374 S.E.2d 669, 670 (S.C. 1988); *State v. Sapps,* 369 S.E.2d 145, 146 (S.C. 1988).

## Conclusion

Based on the foregoing, this Court hereby grants the Petition for Writ of Habeas Corpus on a conditional basis in order to provide the State 90 days to determine if it wishes to retry Petitioner.

**AND IT IS SO ORDERED**.

_____
Richard Mark Gergel
United States District Court Judge

August _11_, 2011
Charleston, South Carolina